Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8403 | **DATE** | 3/26/2002 |
| **CASE TITLE** | HAROLD B. CARR vs. AMERITECH CORPORATION | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Court grants Ameritech's motion for summary judgment [12-1]. This case is hereby terminated and all other pending motions are stricken as moot. This is a final and appealable order. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | MAR 27 2002 | | 21 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| | CG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 2 7 2002

| | | |
|---|---|---|
| HAROLD B. CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| AMERITECH CORPORATION, | ) | 99 C 8403 |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Harold B. Carr ("Carr") has sued Ameritech Corp. for race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Ameritech has moved for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants Ameritech's motion.

### Facts

Carr, an African American, began his employment with Illinois Bell in 1969 and is currently employed by Ameritech as a Telecommunications Specialist in Chicago Illinois. (Def.'s LR 56.1(a)(3) ¶ 2.) From 1995 through 1997, Jeff Kelmis ("Kelmis") was Carr's immediate supervisor. (*Id.* ¶ 7.) Beginning in 1997, Carr reported to Fred Martin, but still continued to report to Kelmis for days off work and vacation scheduling. (Pl.'s LR 56.1(b)(3)(A) ¶ 7.)

Carr alleges three types of adverse employment actions: (1) his seniority rights were violated in the manner in which vacation periods were determined, (2) he was



denied medical benefits for time off from injury and illness, and (3) he was denied the opportunity to work overtime.

## A. Selection of Vacation Time

Carr claims that he has been discriminated against based on his race and gender with regard to the manner in which vacation time was scheduled. Carr has been with the company since 1969 and argues that because of his high seniority he was allowed to select whatever vacation dates he wanted. The employees select their vacation dates the year before they use them. (Def.'s Ex. 3, Carr Dep. ("Carr Dep.") at *14.)[1] Carr and the rest of the employees in his group made their date selections in late 1998 for 1999. (*Id.* at *15.) Carr had twenty days of vacation per year. (*Id.* at *29.) He customarily used his vacation days during holiday weeks such as Memorial Day and Labor Day so as to stretch out the amount of consecutive time off. (*Id.* at *29-*30.) In 1998, Carr used the combination of holidays and his twenty vacation days to pick six full weeks of vacation. (*Id.* at *30.) After he selected his vacation days, he was informed that while he was not losing any of his vacation days, employees could only use vacation days to accumulate five full weeks off. (*Id.*) This had not been the case in previous years. (*Id.* at *29-*30.) In order to pare down his six weeks to five, Carr chose to eliminate the full week of vacation during the week after the Thanksgiving holiday. (*Id.* at *30.) The next week he changed his mind. (*Id.*) Carr wanted to keep the week of Thanksgiving and eliminate his

---

[1]The binding of defendant's exhibits rendered the pages of Defendant's Exhibit 3, Carr's Deposition Transcript without legible page numbers. Accordingly, the Court has assigned its own sequential numbering, pages *1 through *32, so that it may refer to such pages. The asterisk denotes that the page cited is according to the Court's sequential numbering, not the actual deposition page numbers.

week off after Christmas. (*Id.* at \*30-\*31.) However, by that time a co-worker had picked the week after Thanksgiving. (*Id.* at \*12-\*13, \*31.) Instead of starting the process over so Carr could change his selection of vacation dates, his supervisors decided to leave the schedule as it was. (*Id.* at \*31.) In the end, Carr could not change his initial selection and he ended up with vacation during the week of Christmas instead of Thanksgiving. (*Id.*) As it turned out, Carr was on medical leave in November and December of 1999 with a partially torn Achilles tendon. (Def.'s LR 56.1(a)(3) ¶ 44.) Carr received all the vacation time he was entitled to in 1999. (*Id.*)

## B. Disability Benefits

Carr's second claim is that he was discriminated against based on race and gender when he was denied medical benefits in 1995 and 1999. As a member of the International Brotherhood of Electrical Workers Local 165, Carr's employment is covered by a Collective Bargaining Agreement (CBA). (*Id.* ¶ 14-15.) The CBA allows for payment of absences due to personal illness up to a maximum of five days. (*Id.* ¶ 21.) After that, absences longer than seven consecutive days are determined by Ameritech's Sickness and Accident Disability Plan ("the Plan"). (*Id.*) Decisions relating to rights, eligibility of employees, and administration of the plan have been ultimately vested in a Benefits Committee. (*Id.* ¶¶ 21-28.) Furthermore, if an employee fails to give proper information respecting his condition, he will not be entitled to benefits under the Plan. (*Id.*)

Carr points to two incidents in which he was denied medical benefits. The first occurred in 1995 when Carr had conjunctivitis. (*Id.* ¶ 29.) After contracting

3

conjunctivitis, Carr applied for and received short-term disability benefits from August 7 through August 14, 1995. (*Id.*) Starting on August 15, 1995, the Ameritech Employees' Benefit Committee denied Carr any further benefits under the Plan. (*Id.*) Carr was informed of the Committee's final decision denying him further benefits on a letter dated December 21, 1995. (*Id.* ¶ 30.) Carr claims that the denial to him of additional disability benefits in 1995 was because of his race and his gender. Ameritech claims that Carr's additional benefits were denied by the Benefits Committee because the medical information that the Carr submitted did not indicate that he had any complications relating to conjunctivitis, failed to provide a plan of treatment beyond August 14, and showed he had not received medical care for almost one month. (*Id.*) Carr has stated that he has no reason to believe that the people on the Benefits Committee who denied his claim did so because of his race. (*Id.* ¶ 32.)

The second instance in which Carr was denied medical benefits occurred in 1999. (*Id.* ¶ 35.) In 1999, Carr sustained a partial tear of his Achilles tendon on the left foot while running, a non-work related injury. (*Id.*) Carr applied for and received short-term disability benefits for the period between August 17 through September 9, 1999. (*Id.*) On August 12, 1999, Carr's physician, Dr. Schick, informed Carr's case manager that he could return to work, that his foot was in a cast, and that he was to use crutches, was not to engage in continuous standing or bear weight on his left foot, and was not to walk more than ten yards. (*Id.* ¶ 36.) At that time, Carr's employer told the case manager that his restrictions could not be accommodated at the work place.[2] (*Id.* ¶ 36.) Nearly a

---

[2] Carr objects to defendant's reliance on documents from his administrative disability file in support of its motion for summary judgment because: (1) such documents are not affidavits, depositions or answers to interrogatories, which he perceives as a violation of LR 56.1(a); and (2) such documents are hearsay. The Court finds these arguments without merit. First, Carr has stipulated that these documents are admissible in the parties' Final Pre-trial Order. Second, even if he had not stipulated as such, such documents would be admissible under the business records exception to the hearsay rule. FED. R. EVID. 803(6).

month later, on September 8, 1999, Carr's superior, Fred Martin, told the case manager that Carr's restrictions could be accommodated and therefore, benefits would cease. (*Id.* ¶ 37.) Around this time, Carr informed the case manager that he would need a wheelchair to return to work. (*Id.*) According to Carr, rather than providing a wheelchair, his supervisors, Fred Martin, John Hannon, and Matthew Robinson decided that he should stay home. (Pl.'s LR 56.1(b)(3)(A) ¶ 37.) Carr did not return to work until December 17, 1999 because Ameritech did not provide him with a wheelchair. (Def.'s LR 56.1 (b)(3)(B) ¶ 42).

The Benefits Committee denied Carr any additional benefits starting on September 10, 1999. (Def.'s LR 56.1(a)(3) ¶ 35.) Carr was informed of the Committee's final decision denying him further benefits by a letter dated December 30, 1999. (*Id.*) Kelmis played no role in the Benefits Committee's decision to deny Carr further disability benefits for his injured Achilles tendon in 1999. (*Id.* ¶ 41.) The Benefits Committee based their denial of Carr's benefits on his medical information provided by Carr and his physician, Dr. Schick. (*Id.* ¶¶ 35-39.) The Benefits Committee concluded that the medical information that Carr submitted was conflicting and did not contain clear objective medical findings that sustained Carr's claim that he was so severely impaired as to prevent him from performing the duties of his job with the accommodations offered by Ameritech. (*Id.* ¶ 40.)

Carr believes that he was denied additional benefits under the Plan in 1999 for his Achilles tendon because of his gender. (*Id.* ¶ 42.) Carr refers to a female employee, Angie Shenault, as treated more favorably. (*Id.*) According to Carr, Shenault told him that after having back surgery her doctor restricted her to a specially made chair for her

return to work. (*Id.*) Moreover, she said that since the chair was not available when she first returned back to work, she had to go out on leave because the chair was not ready and that "she didn't lose any pay." (*Id.*) Carr claims that he could not return to work because he had not been provided with a wheelchair and foot elevation and therefore, he should have continued to receive benefits. (Pl.'s LR 56.1(b)(3)(A) ¶ 42.)

## C. Opportunity for Overtime

Carr's third claim is that he was denied the opportunity to accept or deny overtime. Carr had previously filed two grievances, in October 1997 and April 1998, in which he complained, among other things, that his supervisor, Kelmis did not offer him the opportunity to accept or decline overtime. (Def.'s LR 56.1(a)(3) ¶ 18.) At the end of 1998 or beginning of 1999, these grievances were addressed at a meeting at which Carr, his superiors, and his union representatives were present. (*Id.* ¶ 19.) According to Carr, some of the other employees had seventy or more hours of overtime while Carr had only 13½ hours. (Pl.'s LR 56.1(b)(3)(A) ¶ 19.) While Carr's second overtime grievance was settled for four days of overtime pay, his first overtime grievance was not settled at all. (*Id.*)

The disputed overtime work required special work called "provisioning." In 1994 Carr started working in the Technology Transport Center as a Telecommunications Specialist. (Def.'s LR 56.1(a)(3) ¶ 6.) During this time Carr worked under Kelmis and performed work called "alarm acceptance testing." (*Id.* ¶¶ 6-7.) Alarm acceptance involves accessing equipment from a computer workstation to test the alarm systems of Ameritech's telecommunications equipment. (*Id.* ¶ 6.)

Besides supervising Carr, Kelmis also supervised a group of employees who did provisioning work. (*Id.* ¶ 8.) Provisioning involves using a computer workstation to assist in the process of turning up Ameritech facilities in different states. (*Id.*) In some states, provisioning requires remotely placing electronic cross connection to turn the facilities up. (*Id.*) During the time that Kelmis supervised Carr, it was the provisioning work that sometimes required employees for overtime. (*Id.* ¶ 9.) Kelmis only gave overtime to those employees who remotely placed electronic cross connection during regular working hours. (*Id.* ¶ 10.) Ameritech points to Sharon Prince and Delores Edwards, two African American employees who did electric cross connection and received provisioning overtime. (*Id.* ¶ 10.) Ameritech also points to Joe Laurence, a Caucasian employee who did not perform electronic cross connection during regular working hours and did not receive provisioning overtime. (*Id.*)

Carr states that he had been trained to do electronic cross connections at the Ameritech center. (Pl.'s LR 56.1(b)(3)(A) ¶ 6.) However, Carr did not do electronic cross connections every day during regular working hours. (Def.'s LR 56.1(a)(3) ¶ 10; Pl.'s LR 56.1(b)(3)(A) ¶ 12.)

Carr claims that Kelmis denied him overtime because of his race. He bases this conclusion on the fact that he was number two on the seniority list, but got very little overtime. (Pl.'s LR 56.1(b)(3)(B) ¶ 1.) Carr states that Kelmis never wanted to talk with Carr about his job function or ability to perform other tasks. (Pl.'s LR 56.1(b)(3)(A) ¶ 13.) Carr heard second-hand that Kelmis made a racially derogatory statement.[3] (*Id.*)

---

[3]Carr explains that several people, excluding himself, heard Kelmis make a racially derogatory comment while talking on the phone to another person. Carr explains that one of the people who overheard this comment told another person, who then told Carr. This is clearly inadmissible hearsay, and accordingly, the Court has not considered the statement when ruling on defendant's motion for summary judgment.

On September 27, 1999, Carr filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In his charge he complained that he was denied overtime because of his race and that he was denied salary in 1999 because of his race and his gender. (Def.'s LR 56.1(a)(3) ¶ 45.) On September 30, 1999, the EEOC issued to Carr a Dismissal and Notice of Rights.

## Discussion

Under Rule 56(c), summary judgment is proper once the moving party has established that no genuine issue of material fact requiring resolution at trial can be found in the record and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing motions for summary judgment, courts must view the evidence in the light most favorable to the non-moving party, meaning that any doubt as to the existence of genuine issues of fact will be resolved against the moving party. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987). However, a party may not rest upon pleadings to oppose a motion for summary judgment and must set forth specific facts showing that there is a genuine issue of material facts for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the party opposing a motion for summary judgment bears the burden of proof on an issue, he or she must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial. *Sarsha v. Sears Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993). The nonmoving party's own affidavit or deposition can constitute affirmative evidence to defeat a summary judgment motion.

*Id.*; *Wilson v. Williams*, 997 F.2d 348, 351 (7th Cir. 1993). Further, the summary judgment standard is applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Robinson v. PPG Indus., Inc.* 23 F.3d 1159, 1162 (7th Cir. 1994). Still, "[i]n an employment discrimination case, a claimant must present more than conclusory allegations to defeat a motion for summary judgment." *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998).

"A plaintiff can avert summary judgment for the defendant in an employment discrimination case either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a *prima facie* case under the *McDonnell Douglas* formula." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 940 (7th Cir. 1997). In order to establish a *prima facie* case of gender or race discrimination, a plaintiff must show: 1) that he belongs to a protected class, 2) that he performed his job satisfactorily, 3) that he suffered an adverse employment action, and 4) that his employer treated similarly situated employees outside of his classification more favorable. *Markell v. Board of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (gender); *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994) (race).

If the plaintiff succeeds, the burden of production then shifts to the employer, who must articulate a "legitimate, nondiscriminatory reason" for the adverse action. *See Pafford v. Herman,* 148 F.3d 658, 665 (7th Cir. 1998) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "If the employer carries this burden, then the burden shifts back to the plaintiff to produce 'evidence that would, if believed by a trier of fact, show that the true reason for the employment action was discriminatory.'"

*Pafford*, 148 F.3d at 665 (quoting *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169 (7th Cir. 1998)).

Carr has conceded that he does not have any direct evidence of discrimination and that all his claims must be considered using the burden shifting method in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (*See* Pl.'s Resp. Br. at 2.) Both parties agree that Carr is an African-American male, and thus he is a member of a protected class. The second prong of the *prima facie* case relates to job performance. The parties have not made Carr's job performance an issue in this case, which leaves the last two prongs.

Carr claims he has suffered three adverse employment actions. First, he claims that his request for particular vacation days was denied. Second, he argues that he was denied salary during medical leave in 1995 and 1999. Third, he claims that he was denied overtime opportunities.

**A. Selection of Vacation Time:**

In order to establish a *prima facie* case for discrimination, Carr must show that the denial of particular vacation dates was an adverse employment action. *See Hughes*, 20 F.3d at 746. Carr has failed to convince the Court that the events surrounding the choosing of vacation time for 1999 amounted to an adverse employment action. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). "[A] materially adverse change in employment

conditions must be more disruptive than a mere inconvenience . . . ." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 932 (7th Cir. 1996).

In his reply to the motion for summary judgment Carr impressively cloaks this claim in ambiguity.[4] However, his deposition clarifies the matter. In his deposition, Carr states that for the 1999 work year he received twenty vacation days. (Carr Dep. at *11.) At no time does Carr allege that he actually lost any of these days. Rather, unlike in previous years in which he creatively selected his vacation days in combination with holidays such as Christmas and Thanksgiving and floating holidays to stretch his twenty days to cover six full weeks, Carr was told that he could only use his twenty vacation days to cover five full weeks. (*Id.* at *11-*13.) Upon being told that policy, Carr decided to eliminate the full week of time off that directly followed the Thanksgiving holiday. (*Id.* at *12.) The next week, Carr realized he would rather eliminate his full week of vacation after the Christmas holiday. (*Id.* at *12-*13.) Carr attempted to change the schedule, but it was too late – another employee had already picked that week off. (*Id.* at *13.)

Again, at no time does Carr put forward evidence that he lost any of his twenty vacation days. Rather, he complains that he was not allowed to use the vacation days in a manner that would allow him six full weeks instead of five and that he was not allowed to re-select his particular vacation dates when he changed his mind after his initial selection.

---

[4] Carr's response to defendant's version of the events states only: "Harold Carr is allowed five weeks of vacation. After picking his vacation days, Harold Carr was told to give back a week. After picking days for the two previous years, Carr could no longer pick all his days. Kelmis said that Carr could no longer pick his weeks the same with no explanation." (Pl.'s LR 56.1(b)(3)(A) ¶ 44.)

While the actual loss of vacation days may constitute a material loss of benefits, Carr has presented no evidence that such a deprivation of material benefits occurred. Besides the instruction that he may only use his twenty vacation days to take five full weeks off instead of his usual six full weeks (using holidays and floating holidays etc.), Carr has presented no evidence regarding the initial selection of vacation dates, the usual process by seniority, or whether he lost any of his twenty paid vacation days. Carr merely has established that after his initial selection of vacation dates, he changed his mind and made a request to change his vacation dates. At worst, Carr was denied the opportunity to change his vacation schedule. Courts have held that a singled denied vacation request is not a material loss of benefits and thus is not an adverse employment action. *See Wilkosz v. Hudson Respiratory Care, Inc.*, No. 99 C 309, 2000 WL 1705252, at *10 (N.D. Ill. Nov. 14, 2000); *Rice v. Central DuPage Hosp.*, No. 96 C 2405, 1999 WL 199241, at *5 (N.D. Ill. Mar. 31, 1999).

The Court finds *Wilkosz* and *Rice* persuasive and holds that Carr's denied vacation request is not a material loss of benefits. Accordingly, there was no adverse employment action relating to Carr's vacation time and Carr has failed to establish a *prima facie* case of discrimination. Even if the Court were to hold that Carr's denied vacation request was an adverse employment action, Carr also fails to establish a *prima facie* case because he has presented no evidence of a similarly situated employee that was treated more favorably. Accordingly, the Court grants defendant's motion for summary judgment as to Carr's gender and race discrimination claims based on denied vacation requests for particular vacation dates.

## B. Denial of Disability Benefits

Carr's second claim is that he was denied salary during medical leave in 1995 and 1999. We address each denial in turn.

### 1. Conjunctivitis: 1995

In 1995, Ameritech denied Carr salary for missed days of work resulting from his conjunctivitis. Carr alleges that this denial was due to race and gender discrimination. This claim fails because it is untimely. Under section 1981, Carr's claims of discrimination are subject to Illinois' two-year personal injury statute of limitations. 735 ILL. COMP. STAT. 5/13-202; *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999). In addition, under Title VII, Carr was required to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") or the Illinois Department of Human Rights, "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e); *see Conley v. Vill. of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000).

In a letter dated December 21, 1995, the Benefit Committee told Carr of its decision to deny him short term disability benefits. On September 27, 1999, almost four years later, Carr filed charges with the Equal Employment Opportunity Commission. (Def.'s LR 56.1(a)(3) ¶ 45.) He filed the complaint in the instant case on December 27, 1999–well beyond the statutes of limitations of Title VII and section 1981.[5] With respect to Carr's discrimination claim for denied disability benefits for his conjunctivitis in 1995, summary judgment must be granted because the claim is time-barred.

---

[5] Carr has not argued that either equitable estoppel or equitable tolling applies in this case.

Even if the Court were to hold that Carr's claim for conjunctivitis disability benefits was timely, which it does not, this claim would still fail because Carr has not established the *prima facie* case necessary to infer discrimination. The record is devoid of evidence of a similarly situated employee outside of his class that was treated more favorably than he. Carr admits that in connection with his claim for additional disability benefits for conjunctivitis in 1995, he has not identified anyone who was similarly situated to him, was not African-American, but was treated more favorably. (Def.'s LR 56.1(a)(3) ¶ 33.) That leaves only his gender discrimination claim. Carr's only evidence of gender discrimination is a reference he makes in his deposition to an African American woman named LaTanya Williams. (Carr Dep. at *8.) However, according to Carr, Williams received the *same* disability benefits as Carr. (*Id.* at *9.) Carr cannot identify anyone with conjunctivitis who was treated any better. (*Id.* at *8.) Because Carr cannot identify any similarly situated employee outside of his class that was treated *more* favorably, he has not established a *prima facie* case of racial or gender discrimination.

**2. Torn Achilles Tendon: 1999**

Carr's second claim for disability occurred in 1999 when he partially tore his Achilles tendon. Carr asserts that he was denied his disability benefits because of his gender. (*Id.* at 85-86.)

This claim also fails for want of a similarly situated employee who was treated more favorably than Carr. Carr's sole example of a similarly situated employee is Angie Shenault. Putting aside the hearsay issue,[6] which alone would preclude Carr from

---

[6] Carr's evidence is all based on statements he alleges Shenault made to him. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994) (stating hearsay cannot create a genuine issue of material fact).

winning on this point, the claim fails because Shenault was not similarly situated. According to Carr, Shenault was treated more favorably because she "was provided with a special chair to accommodate her back injury, but no wheelchair or foot elevation was provided to Carr." (Pl.'s Ex., Carr. Aff. ¶¶ 12-13.) In addition, Shenault told Carr that during her absence "she didn't lose any pay," (Def.'s LR 56.1(a)(3) ¶ 42), whereas Carr was not paid during his time off.

It would appear that Shenault was treated more favorably than Carr. She received a special chair and benefits for the time she spent away from work where Carr did not. (*See* Def.'s LR 56.1(a)(3) ¶ 42.) However, Carr does not establish a sufficient level of similarity between himself and Shenault. While it may be true that both Carr and Shenault were told to stay home until they could attend work, that alone is insufficient to support the claim that they are similarly situated. Shenault never reported to Carr's old supervisor, Kelmis. (Def.'s LR 56.1(a)(3) ¶ 43.) Furthermore, Carr has not put forward any evidence that he and Shenault had the same supervisor during the time period of both of their absences. A plaintiff is ordinarily required to show that a common supervisor made the relevant decision in order to establish substantial similarity. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (7th Cir. 2000). "Different employment decisions, concerning different employees, made by different supervisors are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Id.* Besides providing no evidence that he and Shenault shared the same supervisor, Carr has not shown that their disability claims were reviewed by the same Benefits Committee. Carr has not produced any evidence of the nature, extent, or duration of Shenault's absence.

Most importantly Carr has failed to address the difference between Shenault's doctor's orders, which required that she not go back to work without a special chair (Def.'s LR 56.1(a)(3) ¶ 42), and his doctor's orders, which were significantly less clear as to the medical necessity of a wheelchair (Def.'s LR 56.1(a)(3) ¶¶ 35-39). Because the Benefits Committee relied on Carr's medical records to determine eligibility for disability benefits, such a distinction is of peak importance for Carr. In sum, given the undisputed facts in the record, Carr has failed to establish that a similarly situated female was treated more favorably. Therefore, the Court grants defendant's motion for summary judgment as to his gender discrimination claim based on the denial of disability benefits relating to his torn Achilles tendon in 1999.

### 3. Pretext

Finally, even if Carr's discrimination claims based on the 1995 disability benefits denial were not time-barred and even if had established *prima facie* cases of discrimination based on the 1995 disability benefits denial, in the face of legitimate race-neutral reasons proffered by Ameritech, Carr has failed to provide evidence that Ameritech's reasons for denying him medical benefits for his conjunctivitis or his torn Achilles tendon are a pretext for discrimination. *See Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Id.* at 684. "On the issue of pretext, our only concern is the honesty of the

employer's explanation." *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997).
Even if Ameritech's reasons for denying Carr's disability benefits were "mistaken, ill
considered or foolish, so long as [Ameritech] honestly believed those reasons, pretext has
not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

    In support of the Benefits Committee's decision to deny Carr disability benefits,
Ameritech points to the Collective Bargaining Agreement for the International
Brotherhood of Electrical Workers. Carr's two claims for disability benefits would be
governed by the 1989 Ameritech Sickness and Accident Disability Benefit Plan and the
1996 Ameritech Sickness and Accident Disability Benefit Plan. Under the respective
plans, a Plan Administrator or the Benefits Committee possesses ultimate authority for
determining whether an Ameritech employee should receive disability benefits. (Def.'s
LR 56.1(a)(3) ¶¶ 21-28.) In 1995, the Benefits Committee denied Carr disability benefits
beyond his first seven days of his illness because the medical information submitted by
Carr did not indicate any complications, failed to provide a plan of treatment beyond
August 14, 1995, and indicated that Carr had not received any medical care for almost
one full month. (Def.'s LR 56.1(a)(3) ¶ 32.) In 1999, the Benefits Committee denied
Carr benefits because the medical information that Carr submitted had conflicting and
unclear medical findings. The Benefits Committee determined that Carr had not
submitted medical information that substantiated his claim that he was so impaired from
his torn Achilles tendon that he could not perform his desk job with reasonable
accommodations offered by Ameritech. (Def.'s LR 56.1(a)(3) ¶¶ 35-40.)

    While the results of the Benefits Committee determinations may have been
mistaken or unfair, even if we assume that Carr's medical records were flawlessly

submitted, absent additional evidence, Carr has not presented any evidence which could lead a reasonable jury to conclude that the Benefits Committee's reasons for denying his disability benefits were a pretext for discrimination. Whether or not Carr should have received his benefits in the first place is not the question at hand. Rather, we must ask whether there is evidence sufficient to support a finding that he was denied those benefits as a pretext for discrimination. In both 1995 and 1999, it was the Benefits Committee that made the decisions regarding disability compensation. Although Carr does submit conclusory allegations about Kelmis, he has not put forward any evidence, beyond sheer speculation, that the Benefits Committee's decision was tainted or that its reasons for its denials of benefits were not the real reasons. Carr even admits in his deposition that he has no reason to believe that the decisions of the Benefits Committee in 1995 were discriminatory. (Def.'s LR 56.1 (a)(3) ¶ 32.) Further, he fails to point to a single piece of evidence with regard to the Benefits Committee's decision in 1999 being a pretext for discrimination. For the reasons stated above, summary judgment is granted for Ameritech on both of Carr's discrimination claims based on the denial of disability benefits.

## C. Opportunity for Overtime

Finally, Carr claims racial and gender discrimination occurred when he was denied the opportunity to work overtime. Like Carr's other claims, the Court finds this claim fatally flawed.

Nowhere in the record does Carr provide a single specific example of a similarly situated employee outside of his protected class who was treated more favorably. Instead

he makes a general argument that he was treated differently based on his race because "Kelmis offered overtime to other employees most of whom were white." (Pl.'s Mem. Law at 2.) Because Carr has failed to offer any specific evidence of a similarly situated employee outside of his class who was treated more favorably he has not established a *prima facie* case of racial or gender discrimination. Therefore, no discriminatory intent can be inferred.

Moreover, Ameritech has provided legitimate race-neutral reasons why Carr did not receive the opportunity to do overtime. Kelmis, Carr's supervisor, stated that he did not give provisioning overtime to employees who did not perform electronic cross connection during regular work hours. (*Compare* Def.'s LR 56.1(a)(3) ¶ 10, *with* Pl.'s LR 56.1(b)(3)(A) ¶ 10.) Although Carr had been trained to do electronic cross connections, he concedes that his work at Ameritech did not consist of performing electronic cross connections every day during regular work hours. (Pl.'s LR 56.1(b)(3)(A) ¶ 12; Pl.'s Ex., Carr Aff. ¶ 4.)

Finally, Ameritech has offered evidence that two African Americans who did work electronic cross connections during regular working hours were given provisioning overtime. (Def.'s LR 56.1(a)(3) ¶ 10.) Ameritech has also offered evidence of a Caucasian male who, like Carr, did not perform electronic cross connections during regular working hours and did not receive provisioning overtime. (*Id.*)

Even if Carr had established a *prima facie* case of discrimination with regard to provisioning overtime opportunities, he ultimately fails to establish a genuine issue as to a material fact regarding whether Ameritech's race-neutral reasons for denying him provisioning overtime were a pretext for discriminations. Carr offers one hearsay

statement[7] as well as some conclusory allegations that are insufficient to raise any questions of fact. Because Carr has failed to point to a similarly situated employee not in his protected class that was treated more favorably and because he has failed to raise a genuine issue as to a material fact regarding Ameritech's race-neutral reason for denying him the opportunity for provisioning overtime, the Court grants Ameritech's motion for summary judgment as to this claim.

## CONCLUSION

For the reasons provided in this Memorandum Opinion and Order, the Court grants Ameritech's motion for summary judgment [doc. no. 12-1]. This case is hereby terminated. All other pending motions are denied as moot.

**SO ORDERED**                    ENTERED: 3/26/02

_____
**HON. RONALD A. GUZMAN**
**United States Judge**

---

[7] _See supra_ n.3.